Filed 2/14/25

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| TARLOCHAN SANDHU, | C100028 |
| Plaintiff and Appellant, | (Super. Ct. No. 34-2022-80003801-CU-WM-GDS) |
| v. | |
| BOARD OF ADMINISTRATION OF THE PUBLIC EMPLOYEES' RETIREMENT SYSTEM, | |
| Defendant and Respondent; | |
| REGIONAL GOVERNMENT SERVICES, | |
| Real Party in Interest and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, James P. Arguelles, Judge. Affirmed.

Law office of Scott N. Kivel, Scott N. Kivel; Redwood Public Law and Sky Woodruff for Plaintiff and Appellant.

Law office of Scott N. Kivel, Scott N. Kivel; Redwood Public Law and Sky Woodruff for Real Party in Interest and Appellant.

Renne Public Law Group, Arthur A. Hartinger and Maribel Lopez for League of California Cities and California Special Districts Association as Amici Curiae on behalf of Plaintiff and Appellant and Real Party in Interest and Appellant.

Matthew G. Jacobs, Renee Salazar, Elizabeth Yelland and Preet Kaur for Defendant and Respondent.

Twenty years ago, in *Metropolitan Water Dist. v. Superior Court* (2004) 32 Cal.4th 491, our Supreme Court held the Public Employees' Retirement Law (PERL) (Gov. Code § 20000 et seq.)[1] incorporates the common law test for employment, and that public agencies that contract with the Public Employees Retirement System (CalPERS) are required to enroll all their common law employees in CalPERS. In this case, the Board of Administration of CalPERS determined Tarlochan Sandhu worked for several cities as a common law employee after he had retired from public service, in violation of rules governing postretirement employment, and the trial court upheld that determination. Sandhu appeals, arguing (1) the Legislature has abrogated the common law test for employment in the circumstances of this case, (2) if the common law test applies, CalPERS and the trial court both erred when they found he was a common law employee, and (3) CalPERS's decision was based on underground regulations. We disagree with the first two arguments and find the third was forfeited, and we thus affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

From 1989 to 2011, Sandhu worked for various public agencies as a finance and accounting professional. Through his employment, he was a member of CalPERS and was entitled to retirement benefits under the PERL. He retired in September 2011, and began receiving a CalPERS retirement allowance in December 2011.

---

[1] Undesignated statutory references are to the Government Code.

2

In February 2015, Sandhu was hired by Regional Government Services (RGS). RGS hires people with prior public sector work experience and assigns them to work for public sector agencies. RGS's executive director explained RGS was formed "to provide a way for smaller public agencies to obtain professional level . . . services in . . . the quantity that they need[]."

Pursuant to the terms of Sandhu's written employment agreement, he was an "at-will" employee of RGS. RGS would assign Sandhu to "multiple clients" "to provide finance advisory functions." He was initially assigned to the City of Capitola (Capitola), and he was thereafter assigned to the Town of Los Altos Hills (LAH), the City of Alameda (Alameda), and the City of Union City (Union City) (collectively referred to as "the Cities"). RGS paid Sandhu an hourly rate that fluctuated based on the type of work and the scope of services he performed, and RGS, in turn, billed the Cities for the hours he worked. To give one example, RGS paid Sandhu $75 per hour for the work he did for Capitola, and it billed Capitola $100 per hour for Sandhu's services.

RGS and Sandhu considered RGS to be Sandhu's sole employer. RGS—not the Cities—was responsible for providing Sandhu with workers' compensation, disability insurance, sick leave required by law, a 401(k)-type retirement plan, and "anything else that the law might require that [an employer] provide to an employee." He reported his time using RGS's online payroll software. As noted, he was paid by RGS, and RGS was responsible for paying all employment-related taxes and issuing W-2s.

RGS entered in written agreements with each of the Cities for Sandhu's services. The agreements with Capitola, LAH, and Union City were similar and all provided, "It is understood that the relationship of RGS to [the city] is that of independent contractor and all persons working for or under the direction of RGS are its agents and employees and not agents or employees of [the city]. [¶] . . . [¶] [The city] shall not have the authority to direct how services are to be performed, specify the location where services are to be performed, or establish set hours or days for performance of services, except as set forth

3

in the" agreement. They also provided, "In the event that [the city], at any time during the term of this Agreement, desires the reassignment of personnel, [the city] shall make a request to RGS, and RGS shall meet and confer in good faith to consider reassigning such person or persons." Finally, they provided, "This agreement may be terminated by either Party, with or without cause, upon 30 days written notice." The Alameda agreement was different. It provided: "City and [RGS] intend that the relationship between them created by this Agreement is that of employer-independent contractor. The manner and means of conducting the work are under the control of [RGS], except to the extent they are limited by statute, rule or regulation and the express terms of this Agreement." It also provided, "City shall have the option, at its sole discretion and without cause, of terminating this Agreement by giving seven (7) days prior written notice."

All told, Sandhu worked for the Cities from February 2015 to May 2016.

### Capitola

Sandhu worked for Capitola for approximately 9 weeks, from late February to late April 2015. He worked a flexible schedule that varied from week to week depending on his availability and Capitola's needs. On average, he worked around 24 hours a week.

Capitola's city manager, Benjamin Goldstein, testified he entered into a contract with RGS because the finance director had given notice, and the city was "in the beginning of a budget season" and needed someone who could continue the budget process while "we were recruiting for a new finance director." Sandhu worked for Capitola until it hired a new finance director.

The contract between RGS and Capitola stated Sandhu would "provide Interim Finance Director Services" and "related work as required." Sandhu did some, but not all, of the essential duties listed in the finance director's job description. He prepared the city's annual operating and capital budget and revenue and expenditure forecasts, and provided advice and assistance to the city council, the city manager, and other city staff as asked. He testified he "work[ed] closely" with Goldstein and met with him "[a]t least

4

once a week" to update him on the budget process, but Goldstein did not give him "day-to-day directions" about how to do the work.

Capitola utilizes what is known as "a city manager form of government." Goldstein explained that, under this form of government, the city council hires the city manager, who functions as the city's chief executive and oversees all city employees. The Capitola Municipal Code provides, "It shall be the duty of the city manager and he or she shall have the authority to control, order and give directions to all heads of departments," including the finance director.[2]  (Capitola Mun. Code, § 2.08.090.)

Goldstein testified he considered Sandhu to be an independent contractor.  He was asked whether he supervised Sandhu on a day-to-day basis, and he responded, "I don't know if supervise is the proper term, but I was the prime contact person for him on staff. I was the person [for] whom he was preparing materials, submitting it for review, and discussing what he was working on."  Goldstein testified he was ultimately responsible for the presentation of budget documents to the city council, and although he relied on "consultants or staff" "to do much of the work," "at the end of the day, I'm responsible for that work."  He agreed that, because he had "ultimate authority or responsibility" for the city budget, he "exercise[d] some sort of authority or oversight over the people [he] work[ed] with to prepare the budget."

Goldstein introduced Sandhu to the city council as the "Interim Finance Director," and Sandhu was identified as "Staff" and "Interim Finance Director" at a meeting of the city's finance advisory committee.  On a list of the city's current finance advisory committee members, Sandhu was identified as "Staff Representative" and "Finance Director."  He was provided with a city e-mail address and a cubicle in city hall, where he worked the "[m]ajority of the time."

---

[2]     Sandhu's request that we judicially notice portions of the Cities' municipal codes is granted.

5

***Los Altos Hills***

Sandhu worked for LAH from April 2015 to January 2016. RGS's contract with LAH stated Sandhu would "provide Interim Finance Manager services two (2) days per week; and may perform services on a full time basis as needed." His hours varied, and, on average, he worked less than 60 hours a month.

LAH's finance department had two "professional finance employees"—the administrative services director and the finance manager—and one clerk. The city manager, Carl Cahill, testified he entered into a contract with RGS because "we had a vacancy . . . . The [administrative services] director . . . had left, and so I internally promoted the finance manager [Pak Lin] to the position of [administrative services] director." In her new position as administrative services director, Lin supervised the finance department. While LAH was recruiting for a new finance manager, it hired "RGS and its employees . . . to . . . have somebody fill in and . . . maintain internal controls for our public finances" and "to share in the financial management responsibilities."

Sandhu did some, but not all, of the duties listed in the finance manager's job description. His major duties were "assisting . . . in the accounting functions and also providing advice to the finance director on processing of accounts payable, payroll, and those kinds of things." He testified LAH did not dictate his work schedule, train him how to perform his tasks, give him day-to-day directions, or evaluate his performance.

Cahill testified he viewed Sandhu as a consultant rather than an employee. He also testified he did not supervise Sandhu's "day-to-day" work. When asked whether LAH had control over Sandhu's work, he responded, "Depends on what you mean by control. We certainly had expectations. My expectation is he is a professional public finance expert, so I would have relied on things that he told me." He testified if LAH was not satisfied with Sandhu's work, it would "call RGS and say we have a problem" and "we need to sever this. We don't want him back." He also testified Sandhu would have worked more closely with Pak Lin than with him.

6

Sandhu testified he met with Lin "at least once a week." He also testified LAH was "a very small outfit. And most of the work that was assigned to me, I was able to do on my own without any direction." Lin did not testify at the hearing, but she filled out a questionnaire that was admitted into evidence that stated Sandhu reported to her, she reviewed his work, and LAH had the right to control his work. She also stated Sandhu performed "Interim Finance Manager duties while position was vacant," and he "was filling in for a vacancy for a few months. His role is to assist with daily operation, budget prep & audit." After a new finance manager was hired, Lin requested and received permission to use Sandhu for another month or so in a "limited capacity" to help with the transition.

Sandhu was identified as "Staff" and "Contract Finance Manager" at a city council meeting. LAH provided Sandhu with a cubicle, a phone extension, an e-mail address, and a badge, and he performed most of his work at city hall.

*Alameda*

Sandhu worked for Alameda from July to September 2015. The contract between RGS and Alameda stated he would serve as "Interim Financial Services Manager," and would "[p]erform the functions normally assigned to the Financial Services Manager set forth in the job description . . . which is attached hereto and incorporated herein by this reference, as assigned by the Finance Director." Sandhu generally worked three days a week, although there were several weeks where he worked only one or two days.

Sandhu worked for Alameda while it was in the process of recruiting to fill the financial services manager position, which was vacant. He testified the city "was getting ready for the fiscal year-end close," and he "was helping the staff to get ready for [the] annual audit, and I was assisting them in preparing the audit paperwork" and "documentation for their external audit." He worked with the finance director, who was "the next level at the city," but he could not remember her name (and she did not testify at the hearing). He testified the "majority of the time [he] did not need any direction" on

7

how to prepare the audit paperwork or documentation because he "had th[e] skills to do so" without direction. He testified the city did not dictate his work schedule, train him, or give him a personnel evaluation.

Alameda provided him with a cubicle in city hall, a phone, and an e-mail address.

Sandhu worked for Alameda at the same time he worked for LAH. He did not request permission from either city to work for the other because he "was not their employee. I was the employee of RGS and I was working with my supervisor at RGS to work with different clients."

Sandhu worked for Alameda until shortly after it hired a new financial services manager. He helped the city during the selection process by "evaluating the technical knowledge" of the applicants and he helped bring the new manager "up to speed."

*Union City*

Sandhu worked for Union City from October 2015 to June 2016. The contract between RGS and Union City stated he would "[p]erform Interim Finance Director functions as assigned." On average, he worked less than 30 hours a week.

Antonio Acosta was the city manager during the relevant time period. He testified he entered into a contract with RGS because he "needed a subject matter expert and experienced finance director type of person to fill in temporarily for a vacancy which had been created" by a reorganization. Sandhu testified his "main function was to review the adopted budget and make sure that it's accurate and . . . give the feedback to the city manager based on my evaluation, whether the budget makes sense or not based on my evaluation." He worked with Acosta "[a]t least weekly, every two weeks."

Acosta stated he did not direct Sandhu's day-to-day work, but asked "that he brief me on any new and exciting development or on the status of his big project on a periodic basis, every week or two. And if it was going fine, the meetings would be very quick. If there were issues to resolve or clarification, I might talk about it for a little while." Acosta testified the finance director reported to the city manager, but Sandhu "performed

8

a very truncated finance director workload for the city . . . because we didn't really need . . . a hands-on interim finance director from outside the agency to manage the day-to-day affairs." When asked whether he had the authority to direct Sandhu on the manner in which he did his work, he responded, "No. [¶] . . . [¶] Because that's not the role he was fulfilling in my mind. He came fully actualized and activated and, frankly . . . I didn't have time to hold hands or give explicit direction." Acosta explained, "I never forgot that . . . [Sandhu] was not my employee or the city's employee. He was RGS's employ[ee]. Our agreement with RGS made it very clear whose employee he was and who would direct him, and it wasn't me."

Acosta introduced Sandhu to the city council as a "new hire" and stated "[h]e work[ed] in the Finance Department as an Interim Finance Director." Sandhu sent several agenda items to the mayor and city council in which he identified himself as "Interim Director of Finance." Sandhu signed off on the city's annual financial report, and the report also stated it was prepared by Sandhu. The city provided Sandhu with a cubicle, a phone, and an e-mail address, and he did most of his work at city hall.

As with the other three cities, Sandhu stopped working for Union City when a new finance director was hired.

***The Underlying Administrative Proceedings***

In February 2018, CalPERS began investigating the nature of Sandhu's relationship with the Cities, and in January 2010, it determined he was a common law employee, and his work for Capitola, Alameda, and Union City violated certain postretirement employment rules.[3]

---

**3**     Briefly, the PERL provides, "A retired person shall not serve, be employed by, or be employed through a contract directly by, a public employer in the same public retirement system from which the retired person receives the benefit without reinstatement from retirement, except as permitted by this section." (§ 7522.56, subd. (b).) "A person who retires from a public employer may serve without reinstatement . . .

9

Sandhu appealed, and an evidentiary hearing was held before an Administrative Law Judge (ALJ). There were two issues to be decided: (1) whether Sandhu was a common law employee of the Cities, and (2) if so, whether his employment violated the applicable postretirement employment rules. Following the hearing, the ALJ issued a proposed decision finding Sandhu was a common law employee of all four Cities, and his employment with Capitola, Alameda, and Union City violated the applicable postretirement employment rules, and CalPERS adopted the ALJ's proposed decision with minor modifications.

### The Trial Court Proceedings

Sandhu challenged CalPERS's decision by filing a petition for writ of mandate pursuant to Code of Civil Procedure section 1094.5, arguing the evidence did not support the finding he was a common law employee (he did not challenge the finding that his employment violated the applicable postretirement employment rules).[4] The parties

upon appointment by . . . a public employer . . . because the retired person has skills needed to perform work of limited duration," but such appointments "shall not exceed a total for all employers . . . of 960 hours . . . in a . . . fiscal year" and "[t]he rate of pay for the employment shall not . . . exceed the maximum, paid by the employer to other employees performing comparable duties." (*Id*., subds. (c), (d).) A person employed in violation of these rules must reimburse CalPERS for "any retirement allowance received during the . . . periods of employment that are in violation of law," and must pay to CalPERS "an amount of money equal to the employee contributions that would otherwise have been paid during the period or periods of unlawful employment, plus interest thereon." (§ 21220, subd. (b).)

[4] We note the trial court related this case with four other cases that also involved CalPERS retirees who provided services to cities through RGS, and we grant CalPERS's request to judicially notice the order relating the cases. The petitioners in all five related cases challenged CalPERS's finding they were common law employees. The trial court found in favor of the petitioner in one of the cases (*Abid-Cummings v. Board of Administration of the Public Employees Retirement System*, Super. Ct. Sac, County, 2023, No. 34-2022-80003798), and in favor of CalPERS in four of the cases, including this case, and petitioners in those four cases have all filed notices of appeal. The other three appeals are: (1) *Estate of Douglas Breeze. v. Board of Administration of the Public*

agreed the challenged decision implicated Sandhu's fundamental vested right to receive a retirement benefit, and the trial court was thus authorized to exercise its independent judgment on the evidence.[5] Applying its independent judgment, the trial court found the evidence supported CalPERS's determination that Sandhu was a common law employee of the Cities. We will discuss the basis for the trial court's decision below. Judgment was entered denying the petition, and Sandhu filed a timely notice of appeal.

---

*Employees' Retirement System*, No. C099877; (2) *Dowswell v. Board of Administration of the Public Employees' Retirement System*, No. C100027; and (3) *Souza v. Board of Administration of the Public Employees Retirement System*, No. C099861.

Sandhu has asked us to judicially notice the trial court's decision and the transcript of the hearing in the *Abid-Cummings* case (i.e., one case where the trial court found in favor of the petitioner), and CalPERS has asked us to judicially notice the trial court's decision in the other three related cases. We decline both requests because "only *relevant* material may be [judicially] noticed," and the trial court's decision in the other four cases is not relevant. (*Mangini v. R.J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063, disapproved on other grounds in *In re Tobacco Cases II* (2007) 41 Cal.4th 1257, 1276; see also *Pereira-Goodman v. Anderson* (1997) 54 Cal.App.4th 864, 872, fn. 5 [declining to take judicial notice of superior court decision and noting such decisions "do not have precedential value"].) For a similar reason, we decline the requests by both parties to judicially notice other CalPERS decisions that are nonprecedential, and we grant CalPERS's request to judicially notice one precedential decision. Finally, we also deny Sandhu's (fourth) request for judicial notice, which was filed several months after the case was fully briefed and just one week before oral argument, on the ground that the documents are not relevant to our analysis.

[5]     "Section 1094.5 of the Code of Civil Procedure provides the basic framework by which an aggrieved party to an administrative proceeding may seek judicial review of any final order or decision rendered by a state or local agency." (*Bixby v. Pierno* (1971) 4 Cal.3d 130, 137, fn. omitted.) Where it is claimed the agency's findings are not supported by the evidence, two standards of review apply at the trial court level: the independent judgment standard, and the substantial evidence standard. The independent judgment standard applies in cases where the agency's decision affects a fundamental vested right, and the substantial evidence standard applies in all other cases. (*Id*. at pp. 143-144.)

11

**DISCUSSION**

Sandhu makes two primary arguments on appeal: (1) the common law test for employment is not applicable to the facts of this case, and (2) even if it is applicable, the trial court misapplied the test and/or erred in finding he was a common law employee. He also faults the trial court for failing to rule that CalPERS's decision was based, at least in part, on underground regulations. We discuss each argument in turn. We note at the outset, however, that Sandhu's briefs contain a total of 95 footnotes, and many of these footnotes contain arguments not raised in the body of the briefs. "Footnotes are not the appropriate vehicle for stating contentions on appeal" (*Sabi v. Sterling* (2010) 183 Cal.App.4th 916, 947), and we thus have not considered arguments raised only in footnotes (*Requa v. Regents of University of Californi*a (2012) 213 Cal.App.4th 213, 226, fn. 9).

**I**

**The Common Law Test Applies**

Sandhu's first argument is that the common law test for employment does not apply because, under the circumstances of this case, it has been abrogated by sections 37103 and 53060. Sandhu did not make this argument in the trial court, which would ordinarily result in his forfeiting it on appeal. (See *Howitson v. Evans Hotels, LLC* (2022) 81 Cal.App.5th 475, 489.) Sandhu and CalPERS, however, both cite the "settled" rule that an appellate court has "discretion" to address questions of law even if they were not raised in the trial court. (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 24.) We agree, and we elect to exercise our discretion to address the issue.

A.    *The relevant provisions of the PERL, as interpreted in* Metropolitan Water Dist. v. Superior Court

Pursuant to the PERL, CalPERS provides retirement benefits to its "members," who include "not only state employees but also employees of 'contracting agencies,' that is, public entities . . . that have chosen to participate in CalPERS by contract with the

CalPERS governing board. (§§ 20022, 20460.)" (*Metropolitan Water Dist. v. Superior Court*, *supra*, 32 Cal.4th at p. 499 (*Metropolitan*).) Here, all of the public entities that Sandhu worked for prior to his retirement in 2011, and the four Cities that he worked for after retirement, were contracting agencies.

The PERL defines a " '[m]ember' " as "an employee who has qualified for membership in this system and on whose behalf an employer has become obligated to pay contributions" (§ 20370, subd. (a)), and an "employee[] of a contracting agency" (§ 20383), and it defines an " '[e]mployee' " as "[a]ny person in the employ of any contracting agency" (§ 20028, subd. (b)). "Membership in [CalPERS] is compulsory for all employees." (§ 20502, subd. (a)(3).) "As these provisions indicate, only an agency's *employees*—not those performing services for the agency on other terms—may be enrolled in CalPERS. The PERL makes this rule explicit in section 20300, subdivision (b), which excludes from CalPERS membership '[i]ndependent contractors who are not employees.' " (*Metropolitan*, *supra*, 32 Cal.4th at p. 499.)

In *Metropolitan*, *supra*, 32 Cal.4th 491, our Supreme Court held the PERL incorporates the common law test for employment to distinguish employees from independent contractors. Like this case, *Metropolitan* involved a public agency that contracted with CalPERS to provide retirement benefits to its employees, and also contracted with several labor suppliers to provide it with temporary workers. (*Id*. at pp. 496-497.) The agency considered the workers to be consultants rather than employees and it did not provide them with benefits that were contingent on employment. (*Id*. at p. 497.) A group of workers sued the agency, arguing they were employees and were entitled to all employment-related benefits, including membership in CalPERS, and the trial court permitted CalPERS to intervene in the action. (*Id*. at pp. 497-498.)

Prior to trial, the trial court decided a threshold issue and ruled the agency was required to enroll all common law employees in CalPERS. (*Metropolitan*, *supra*, 32 Cal.4th at p. 498.) The parties sought review of that ruling by petition for writ of

13

mandate, the appellate court denied the petition, and our Supreme Court granted review to decide what it deemed a "purely legal" issue:  whether the PERL required a contracting agency "to enroll in CalPERS all workers who would be considered [its] employees under California common law." (*Metropolitan*, at p. 496; see *id*. at p. 498.)  The agency argued "it may exclude from enrollment workers, such as plaintiffs, who are paid through private labor suppliers, even if they would be employees under the common law test." (*Id*. at p. 496.)  The court disagreed, holding, "the PERL incorporates common law principles into its definition of a contracting agency employee and that the PERL requires contracting public agencies to enroll in CalPERS all common law employees except those excluded under a specific statutory . . . provision." (*Ibid*.)

The court began its analysis by noting, "As to contracting agencies, the PERL gives the term ['employee'] no special meaning, stating simply that an 'employee' means '[a]ny person in the employ of any contracting agency.' (§ 20028, subd. (b).)" (*Metropolitan*, *supra*, 32 Cal.4th at p. 500.)  It then explained, "In this circumstance—a statute referring to employees without defining the term—courts have generally applied the common law test of employment," and, "Unless given reason to conclude the Legislature must have intended the term to have a different meaning in section 20028, subdivision (b), we also can only adhere to the common law test." (*Id*. at pp. 500, 501.)  Finally, it concluded, "the PERL's provision concerning employment by a contracting agency (§ 20028, subd. (b)) incorporates a common law test for employment, and . . . nothing elsewhere in the PERL . . . supports reading into the PERL an exception to mandatory enrollment for employees hired through private labor suppliers." (*Id*. at p. 509.)

RGS is analogous to a labor supplier that provides temporary workers to contracting agencies, and *Metropolitan* teaches that if those temporary workers meet the common law test for employment, then they are employees for purposes of the PERL. Sandhu attempts to distinguish *Metropolitan* by noting (1) the workers in that case were

14

not retired annuitants, and (2) they provided long-term temporary services, while he provided short-term and highly specialized temporary services. He fails to explain why either of those facts would affect the purely legal issue decided in *Metropolitan*.

B.    *Sandhu's Arguments*

Despite *Metropolitan*'s holding that the PERL incorporates the common law test for employment, Sandhu contends that test does not apply because sections 37103 and 53060 have effectively abrogated it in the circumstances of this case.[6] (*Metropolitan*, *supra*, 32 Cal.4th at p. 496.) Sandhu fails to convince.

Section 37103 provides a city "may contract with any specially trained and experienced person, firm, or corporation for special services and advice in financial, economic, accounting, engineering, legal, or administrative matters."[7] Similarly, section 53060 provides any public or municipal corporation (which includes a city) "may contract with and employ any persons for the furnishing . . . [of] special services and

---

[6]    Sandhu also cites a third statute, section 54981, which provides, "The legislative body of any local agency may contract with any other local agency for the performance by the latter of municipal services or functions within the territory of the former." He states the Cities' contracts with RGS "comported with this statutory authority," but he fails to demonstrate that section 54981 is applicable. A "local agency" "means any county, city, city and county, or public district which provides or has authority to provide or perform municipal services or functions," and "municipal services or functions" "includes, but is not limited to, firefighting, police, ambulance, utility services, and the improvement, maintenance, repair, and operation of streets and highways." (§ 54980, subds. (b), (c).) Sandhu points to no evidence that establishes RGS is a "local agency" within the meaning of section 54981. He simply states it is a joint powers agency organized under the Joint Exercise of Powers Act (§ 6500 et seq.), and we note that amici curiae acknowledge "there is no clear authority confirming that a [joint powers agency] is to be recognized as a 'local agency' under . . . section 54981."

[7]    Sandhu asks us to judicially notice some legislative history of section 37103 obtained from Legislative Intent Service. We decline the request because we do not find the limited legislative history is relevant to our analysis. (See *People v. Investco Management & Development LLC* (2018) 22 Cal.App.5th 443, 471, fn. 8.)

advice in financial, economic, accounting, engineering, legal, or administrative matters if such persons are specially trained and experienced and competent to perform the special services required." Sandhu argues the Cities in this case exercised their statutory authority to "contract" for "special services and advice in financial . . . matters" when they entered into their respective contracts with RGS. This may be true, but it is not relevant because nobody is contending the Cities lacked authority to enter into contracts with RGS for Sandhu's services. Moreover, nobody is contending Sandhu was not "specially trained and experienced," or that he did not provide "special services and advice in financial . . . matters" within the meaning of those sections 37103 or 53060. Instead, the issue in this case is whether Sandhu was an employee within the meaning of the PERL when he was performing those special services for the Cities.

Sandhu argues, variously, that: (1) sections 37103 and 53060 have somehow "preempt[ed]" or "partially abrogated" or "modified" the common law test in the circumstances of this case; (2) "[t]he power to contract for highly specialized services necessarily means that the RGS contract describes the legal relationship [between the Cities and Sandhu] even if one or more common law criteria of employment might exist"; and (3) "[t]he plain language of . . . [section] 37103 grants the Cities the right to utilize contracting rather than employment as a means to obtain specialized services from RGS and its assigned employee, Sandhu." Sandhu's argument is not entirely clear. It appears, however, that he contends the fact that sections 37103 and 53060 use the word *contract*— i.e., a city "may contract . . . for special services"—means that any person providing such special services is, ipso facto, an independent *contractor*.

The fact that cities are authorized to contract for special services says nothing about whether the person providing those services is an independent contractor or an employee. And as our Supreme Court has held, " 'the employment relationship is fundamentally contractual.' " (*Guz v. Bechtel National, Inc*. (2000) 24 Cal.4th 317, 335.) Thus, contracting for special services is perfectly compatible with finding the person

16

providing those services is an employee.  Indeed, Sandhu was hired by RGS pursuant to a contract that identifies him as an employee, and RGS thus both contracted for Sandhu's services *and* employed him.  Moreover, section 53060 provides a city may "contract with *and employ*" a person to furnish special services, which appears to acknowledge that a person may be employed by contract, and, perhaps more importantly, to recognize that a person hired by a city pursuant to section 53060 may be an employee.  (Italics added.)

Sandhu cites case law that holds the common law is inapplicable when it has been modified by statute.  (See, e.g., *Lowman v. Stafford* (1964) 226 Cal.App.2d 31, 39 ["when modified by state statutes, the common law is inapplicable in California"]; *Monterey Club v. Superior Court* (1941) 48 Cal.App.2d 131, 145 ["In California the common law is inapplicable where . . . it has been modified by our statutes"].)  This is true, but there is nothing in the language of sections 37103 and 53060 that suggests either statute modifies the common law test for employment for purposes of the PERL.

Sandhu also cites the statement in *Metropolitan* that "[u]nless given reason to conclude the Legislature must have intended the term ['employee'] to have a different meaning . . . , we . . . can only adhere to the common law test."  (*Metropolitan*, *supra*, 32 Cal.4th at p. 501.)  Again, however, nothing in the language of sections 37103 and 53060 gives us reason to conclude the Legislature must have intended to modify the meaning of the term "employee" for purposes of the PERL when a city contracts for special services.  Indeed, we note that section 37103 does not contain the term "employee" or any variation thereof, much less define the term, and section 53060 uses the term "employ" without further definition and would thus appear to be governed by *Metropolitan*'s holding that when a statute refers to employment without defining the term, "courts have generally applied the common law test."  (*Metropolitan*, at p. 500.)

Sandhu argues we must harmonize the PERL with sections 37103 and 53060 and must give effect to each statute.  We agree.  As our Supreme Court has emphasized, " 'A court must, where reasonably possible, harmonize statutes, reconcile seeming

17

inconsistencies in them, and construe them to give force and effect to all of their provisions.' " (*Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, 805.)  Here, however, we find no inconsistency or conflict between the PERL's utilization of the common law employment test, and a city's authority to contract for special services pursuant to sections 37103 and 53060.  Instead, we harmonize and give effect to all of these statutory provisions as follows:  If a contracting agency contracts with a person or a firm for special services as authorized by sections 37103 and 53060, then the common law employment test is used to determine whether the person providing those services is an employee for purposes of the PERL (in which case the person must be enrolled in CalPERS), or an independent contractor (in which case enrollment is not required).

Sandhu cites *Handler v. Board of Supervisors* (1952) 39 Cal.2d 282 and *Kennedy v. Ross* (1946) 28 Cal.2d 569, for the proposition that "[p]ersons performing specialized services on a temporary basis have been held to be neither officers nor employees of the governmental body."  Neither case stands for the proposition that a person performing specialized services can never be deemed an employee, and neither case deals with the issue raised here.

In *Handler*, a county entered into a contract with an attorney and an engineer to assist the district attorney on a discrete project, and one of the issues was whether the attorney and the engineer could be hired by resolution of the board of supervisors, or whether they had to be hired pursuant to ordinances governing the employment of what the court referred to as "officers and regular employees."  (*Handler v. Board of Supervisors*, *supra*, 39 Cal.2d at p. 286; see *id*. at pp. 283-284.)  The court noted counties were authorized by law to contract with and employ persons to provide special services and advice in legal and engineering matters, and it held such persons could be hired by resolution.  In so holding, the court noted in passing that "[p]ersons performing specialized expert services do so on a temporary basis and are neither officers nor

18

[regular] employees, nor do they hold a position with the county. They are more akin to independent contractors." (*Id*. at p. 286.) The court did *not* hold that all persons performing specialized services on a temporary basis are independent contractors rather than employees for purposes of the PERL.

In *Kennedy*, a city entered into a contract with an engineer to furnish plans and specifications for a public works project. Someone filed a lawsuit against the city to restrain it from paying the engineer "on the ground that . . . the [engineer] had not been exempted by the civil service commission pursuant to certain provisions of the city charter." (*Kennedy v. Ross*, *supra*, 28 Cal.2d at p. 571; see *id*. at pp. 570-571.) As a result of the lawsuit, the city controller refused to pay the engineer, and the engineer sought a writ of mandate directing the controller to pay him. The controller argued the contract was illegal because it did not comply with the "civil service employment system" established by the city charter. (*Id*. at p. 571.) The city's civil service commission opined the engineer "was an independent contractor" and was not "subject to the civil service provisions of the charter." (*Id*. at p. 572.) The court agreed, noting that "[t]he provisions of the charter do not foreclose the [city] from entering into contracts with individuals for the performance of professional services as independent contractors," and the civil service system created by the charter only applies " 'to persons *employed in permanent positions* in municipal departments.' " (*Id*. at pp. 572, 573.) As in *Handler*, the court did not hold that all persons performing specialized professional services for a city are independent contractors rather than employees for purposes of the PERL.

Sandhu also cites an Attorney General opinion for the proposition that section 53060 permits a public agency to employ persons with special skills to provide special services when those services cannot be provided by the agency's own employees. The issue in that case, however, was whether the special services could be provided by the agency's employees, not whether persons providing special services are employees or independent contractors. (19 Ops.Cal.Atty.Gen. 153, 155 (1952).)

19

The *Handler* and *Kennedy* cases and the Attorney General opinion contain no discussion of the common law test for employment, no discussion of the meaning of the term "employee" in the PERL, and no discussion of any other issue that is relevant to this case, and it is axiomatic that "case[s] [are] not authority for propositions not considered and decided." (*Picerne Construction Corp. v. Castellino Villas* (2016) 244 Cal.App.4th 1201, 1214-1215.)

In sum, we find nothing in sections 37103 and 53060 affects the holding in *Metropolitan* that contracting agencies are required to enroll all common law employees in CalPERS.

## II

## The Trial Court's Conclusion Sandhu Was a Common Law Employee Is Supported by Substantial Evidence

Sandhu next argues the trial court's decision that he was a common law employee is not supported by the evidence. We first describe the common law test and the trial court's application of that test. We then discuss the applicable standard of review. Finally, we explain why the trial court's determination that Sandhu met the common law test for employment is supported by the evidence.

*A.     The Common Law Test*

"The distinction between independent contractors and employees arose at common law to limit one's vicarious liability for the misconduct of a person rendering service to him. The principal's supervisory power was crucial in that context because ' . . . [the] extent to which the employer had a right to control [the details of the service] activities was . . . highly relevant to the question whether the employer ought to be legally liable for them. . . .' [Citations.] Thus, the 'control of details' test became the principal measure of the servant's status for common law purposes." (*S. G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341, 350 (*Borello*).) "Following common law tradition, California decisions . . . uniformly declare that '[t]he principal test

20

of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired.' " (*Ibid*.) Our Supreme Court has emphasized that "what matters under the common law is not how much control a hirer *exercises*, but how much control the hirer retains the *right* to exercise." (*Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal.4th 522, 533 (*Ayala*).) "Perhaps the strongest evidence of the right to control is whether the hirer can discharge the worker without cause, because '[t]he power of the principal to terminate the services of the agent gives him the means of controlling the agent's activities.' " (*Id.* at p. 531.) Another " ' "means of ascertaining whether or not this right to control exists is the determination of whether or not, if instructions were given, they would have to be obeyed." ' " (*Toyota Motor Sales U.S.A., Inc. v. Superior Court* (1990) 220 Cal.App.3d 864, 875 (*Toyota Motor Sales*).)

Although "the right to control work details is the 'most important' or 'most significant' consideration," courts also consider other factors or " 'secondary' indicia of the nature of a service relationship." (*Borello*, *supra*, 48 Cal.3d at p. 350.) These other factors include: "(a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee." (*Id*. at p. 351; see also *Tieberg v. Unemployment Ins. App. Bd.* (1970) 2 Cal.3d 943, 949 (*Tieberg*).) These factors " 'cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations.' " (*Borello*, at p. 351.)

*B.     The Trial Court's Ruling*

The trial court found the weight of the evidence supported CalPERS's determination that Sandhu met the common law employment test.  It first found the Cities had the right to control his work as evidenced by the fact that they could effectively terminate his services without cause because they had the right to terminate their contracts with RGS without cause.  It acknowledged the contracts between RGS and the Cities stated the Cities could not direct how Sandhu's work was to be performed, but it found "the parties' actual conduct established otherwise.  For example, Sandhu met directly with Goldstein, Lin, and Acosta frequently concerning the work he was performing, and both Goldstein and Lin provided feedback."  It thus found "the control factor weighs in favor of an employee-employer relationship."

The trial court then discussed the secondary factors.[8]  It found three secondary factors weighed in favor of an employment relationship:  (1) the work Sandhu performed was part of the regular business of the Cities; (2) the work was usually done by a city employee under the direction of the city; and (3) Sandhu was paid by the hour rather than by the job (although it found this factor weighed only "slightly in favor of an employee-employer relationship").  It also found three secondary factors were either neutral or not relevant in the circumstances of this case.  In particular, it found (1) the skill required was neutral because Sandhu was performing work that was typically performed by highly skilled city employees; (2) who supplied the tools and the place of work was not relevant

---

[8]     The only secondary factor it did not discuss was "whether the one performing services is engaged in a distinct occupation or business." (*Borello*, *supra*, 48 Cal.3d at p. 351.)  Sandhu does not discuss this factor other than to state the following:  "That RGS and its employee Sandhu had a distinct business performing governmental financial management services based on RGS' staff expertise is clear from both the employment agreement between Sandhu and RGS and from the services agreements between RGS and the Cities."  There is no citation to the record and no further discussion or analysis of this factor, and we thus do not consider it further.

because the services Sandhu was providing were intellectual and case law teaches "the factor of ownership of tools is of little importance where the service to be performed is an intellectual endeavor" (*Tieberg*, *supra*, 2 Cal.3d at p. 954); and (3) the length of time the services were to be performed was neutral because Sandhu's services were only needed until the Cities could fill a vacant position, and the timing of filling the position thus "dictated the lengths of the Cities' contracts, not the nature of the work that Sandhu was performing." Finally, the trial court "disregarded" the one factor that weighed in favor of an independent contractor relationship—the belief or intent of the parties—because the parties' "actual conduct establishes a different relationship."

## C. Standard of Review

In a case such as this one, "[w]here the trial court has independently reviewed an administrative agency's factual findings, an appellate court applies the substantial evidence test *to the findings of the trial court*." (*Davis v. Civil Service Com.* (1997) 55 Cal.App.4th 677, 686, italics added.) "In applying the substantial evidence test, '[the] appellate court focuses on the findings of the trial court, rather than those of the administrative agency.' " (*Hittle v. Santa Barbara County Employees Retirement Assn.* (1985) 39 Cal.3d 374, 388, fn. 9.) The substantial evidence test is deferential. "We must uphold the trial court's findings unless they are ' " 'so lacking in evidentiary support as to render them unreasonable.' " ' " (*Molina v. Board of Administration, etc.* (2011) 200 Cal.App.4th 53, 61.) "[W]e must draw all legitimate and reasonable inferences in favor of the trial court's decision." (*Bell v. Department of Motor Vehicles* (1992) 11 Cal.App.4th 304, 309.) " 'The judgment will be upheld if there is any substantial evidence in support of each of the trial court's essential findings; all contrary evidence will be disregarded on appeal.' " (*Hittle*, at p. 388, fn. 9.)

Sandhu argues we must review the finding that he was an employee de novo, giving "no deference" to either CalPERS's or the trial court's decision. We disagree.

23

"The determination of employee or independent-contractor status is one of fact if dependent upon the resolution of disputed evidence or inferences, and the [agency's] decision must be upheld if substantially supported. [Citation.] If the evidence is undisputed, the question becomes one of law [citation], but deference to the agency's view is appropriate." (*Borello*, *supra*, 48 Cal.3d at p. 349.) Numerous cases hold, "[t]he question whether one is an independent contractor on the one hand or an . . . employee on the other, is *ordinarily* one of fact, the determination of which by the trial court on substantial evidence will be binding on the reviewing tribunal." (*Rogers v. Whitson* (1964) 228 Cal.App.2d 662, 672, italics added; see also *Vendor Surveillance Corp. v. Henning* (2021) 62 Cal.App.5th 59, 75 ["Determining whether a person is an employee or an independent contractor is *generally* a question of fact if it depends on resolving disputes in the evidence" (italics added)]; *Brose v. Union-Tribune Publishing Co.* (1986) 183 Cal.App.3d 1079, 1081 ["Whether a person is an employee or an independent contractor is *ordinarily* a question of fact" (italics added)].) The question of whether a person is an employee or an independent contractor becomes a question of law "only if the evidence is undisputed" (*Becerra v. McClatchy Co.* (2021) 69 Cal.App.5th 913, 948), or if the evidence supports only one credible conclusion (*Borello*, at p. 349), or "if from all the facts only one inference may be drawn" (*Brose*, at p. 1081).

Sandhu contends the question of whether he was an employee or an independent contractor is one of law because the evidence in this case is undisputed. We acknowledge that much (but not all) of the evidence is undisputed. However, this is not a case where only one inference or conclusion may be drawn from the evidence. Our task is thus to decide whether the trial court's decision is supported by substantial evidence.

D.      *Analysis*

     i.      <u>Indicia of RGS employment</u>

Sandhu's first argument is that the trial court erred by failing to consider the indicia of his employment relationship *with RGS*. Again, we must disagree.

24

The trial court noted, "the working relationship at issue is the one between Sandhu and the Cities." We agree. The issue in this case is whether a common law employment relationship existed between Sandhu and the Cities, not whether a common law employment relationship existed between Sandhu and RGS.

In this regard, we note that a long line of case law recognizes that dual employment or coemployment may exist when an entity like RGS supplies workers to clients such as the Cities. As our Supreme Court has explained, "The possibility of dual employment is well recognized in the case law. 'Where an employer sends an employee to do work for another person, and both have the right to exercise certain powers of control over the employee, that employee may be held to have two employers.' " (*Kowalski v. Shell Oil Co*. (1979) 23 Cal.3d 168, 174; see also *Martinez v. Combs* (2010) 49 Cal.4th 35, 76 [noting there may be "situations in which multiple entities control different aspects of the employment relationship. This occurs, for example, when one entity (such as a temporary employment agency) hires and pays a worker, and another entity supervises the work"].)

Indeed, in *Metropolitan* itself, our Supreme Court recognized the possibility that, in a case such as this one, where an entity like RGS supplies workers to clients like the Cities, a particular worker could have "coemployers" who "share or allocate between them certain responsibilities of employment." (*Metropolitan*, *supra*, 32 Cal.4th at p. 506.) The labor suppliers in *Metropolitan*, much like Sandhu does here, argued, "the PERL . . . should be construed to recognize coemployment," and to hold that "labor suppliers, rather than their clients . . . should be deemed the employers for purposes of the PERL, thus excluding workers they supply from the public retirement system." (*Ibid*.) The court rejected this argument, holding, "No legitimate basis exists . . . for finding a coemployment exception to the PERL." (*Ibid*.) It also noted the Legislature has recognized that leased workers are "a special case in certain contexts," but has *not* "provided in the PERL for any coemployment exception to a contracting agency's duty to

enroll [common law] employees in CalPERS. The only relevant legislative choice to date has been to require enrollment of all persons in the 'employ' of the contracting agency." (*Ibid*.) And, as discussed above, it held the PERL incorporates the common law test of employment.

We note there was no suggestion in *Metropolitan* that indicia of a common law employment relationship between the leased workers and the labor suppliers was relevant to the issue of whether the leased workers were common law employees of the contracting agency for purposes of the PERL. Thus, we agree with the trial court that the only relevant question in this case is whether Sandhu was a common law employee of the Cities, and we find no error in its failure to consider indicia of his employment relationship with RGS.

ii.    <u>The trial court's application of the common law test</u>

Sandhu's second argument is that the trial court "failed to apply the uncontroverted evidence in a manner consistent with the law." We understand this to mean either that the trial court misapplied the common law test, or that its findings about the various factors are not supported by substantial evidence, or both. We start with the trial court's finding on the primary factor—the right to control—and then consider its findings on those secondary factors that Sandhu discusses.

a.    *The primary factor—the right to control*

As noted above, " '[t]he principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired.' " (*Borello*, *supra*, 48 Cal.3d at p. 350.) As also noted above, case law teaches, "[p]erhaps the strongest evidence of the right to control is whether the hirer can discharge the worker without cause, because '[t]he power of the principal to terminate the services of the agent gives him the means of controlling the agent's activities.' " (*Ayala*, *supra*, 59 Cal.4th at p. 531.) Sandhu is thus particularly critical of the trial court's finding that "the Cities could effectively terminate Sandhu's

26

services with them," which it found was "strong evidence" that it had the right to control his work, and that this factor thus "weighs in favor of an employee-employer relationship." Sandhu argues, "To the contrary, the RGS contract shows that only RGS held power to *terminate* Sandhu's employment. . . . [Citation.] The Cities had no right to terminate Sandhu; their only recourse was to terminate the RGS contract or to request another RGS advisor." (Fn. omitted.) That is essentially what the trial court found as well: i.e., it found that the Cities "could effectively terminate Sandhu's service *with them*," (italics added) even if they could not "terminate Sandhu's relationship *with RGS*" (italics added). The evidence supports the trial court's findings.

Pursuant to their contracts with RGS, the Cities were expressly given the right to terminate their agreements with RGS "without cause." The Cities could also request another advisor if they were not satisfied with Sandhu's work. Sandhu asserts "[t]he right to cancel the RGS contract is fundamentally different from the right to terminate Sandhu's services," but he fails to explain why this is so. Instead, we agree that the Cities could effectively terminate Sandhu's services *with them* if they were not satisfied with his work, either by terminating their contracts with RGS or by requesting a different advisor. And the Cities' right to terminate Sandhu's services also gave them " 'the means of controlling [his] activities.' " (*Ayala*, *supra*, 59 Cal.4th at p. 531.)

Here is another example that supports the trial court's finding the Cities had the right to control Sandhu's work. Capitola's city manager, Goldstein, testified Sandhu was brought in because "I needed somebody to prepare the budget." The Capitola Municipal Code states, "It shall be the duty of the city manager to prepare and submit the proposed annual budget to the city council" (Capitola Mun. Code, § 2.08.150), and Goldstein testified he was ultimately responsible for preparing the budget and presenting it to the city council, even though he had to "rely on the staff to do much of the work." Goldstein agreed that, because he had ultimate authority over the budget, he also had "authority or oversight over the people [he worked] with to prepare the budget," which would include

27

Sandhu. This evidence establishes the city manager had the right to control Sandhu's work.

Moreover, Sandhu testified he met with Goldstein "[a]t least once a week" to "update [him] on the budget process" and "get his feedback" on "whether he agree[d]" with Sandhu's "professional advice." And Goldstein confirmed he "reviewed all the materials" Sandhu prepared and if there was anything he did not agree with he would "consult" with Sandhu "to resolve those issues." As noted above, one " ' "means of ascertaining whether or not th[e] right to control exists is the determination of whether or not, if instructions were given, they would have to be obeyed." ' " (*Toyota Motor Sales*, *supra*, 220 Cal.App.3d at p. 875.) Maintaining such frequent contact with Goldstein on the status of his work and soliciting Goldstein's feedback and agreement strongly suggests Sandhu would have been required to follow Goldstein's instructions if they were given, which demonstrates the right to control exists.

Finally, Goldstein was asked how his working relationship with Sandhu was different than his working relationship with Capitola's permanent finance director, and he responded: "With an employee relationship, obviously if you are in a situation where you disagree with the department head consistently, you would be in a position to potentially look at termination, performance improvement plans. . . . [¶] With a consultant it's just different, right? When somebody comes in to prepare a specific task, you are going to review it. You are not going to worry about their interpersonal skills, for example." Interpersonal skills aside, Goldstein was asked whether he "had the authority to terminate the contract with RGS or ask for someone else to be assigned" if he was dissatisfied with Sandhu's work, and he responded "yes." Again, the right to terminate Sandhu's services is "the strongest evidence of the right to control." (*Ayala*, *supra*, 59 Cal.4th at p. 531.)

Sandhu spends much time arguing the evidence shows none of the Cities actually exercised control over his work. This may be true, but it is not dispositive (or even particularly relevant). As noted above, "what matters under the common law is not how

much control a hirer *exercises*, but how much control the hirer retains the *right* to exercise." (*Ayala*, *supra*, 59 Cal.4th at p. 533.) " 'If the employer has the authority to exercise . . . control, whether or not that right is exercised with respect to all details, an employer-employee relationship exists.' " (*Tieberg*, *supra*, 2 Cal.3d at p. 949.) "[I]t is not the control actually exercised, but that which may be exercised which is determinative." (*Toyota Motor Sales*, *supra*, 220 Cal.App.3d at p. 875.)

We also note that the lack of control actually exercised by the Cities in this case is easily explained by the fact that the work Sandhu performed was typically performed by a highly skilled employee with extensive experience in public finance.  For example, LAH's Municipal Code provides the city manager has "the duty . . . to prepare and submit the proposed annual budget." (Los Altos Hills Mun. Code, § 2-3.219.)  As LAH's city manager explained, however: "My background . . . is land use planning.  I'm the city manager, but my core competency is not finance. . . .  So I absolutely need another person, a finance professional, to . . . share in the financial management responsibilities." He also explained Sandhu had "finance manager competencies," and he thus did not need to provide Sandhu "with day-to-day direction" and instead "relied on [his] professional expertise." And as Sandhu himself acknowledged, even when he worked for various public agencies before he retired (i.e., when he was admittedly an employee for purposes of the PERL), he did not need much supervision or direction because he had "vast experience" in finance and was thus "qualified" to do the work "without much help from anyone." It is thus not surprising that, when he worked for the Cities, the Cities did not actually exercise control over his work.

Although there is some evidence to the contrary, the evidence is sufficient to support the trial court's conclusion the Cities had the right to control Sandhu's work, even if they rarely, if ever, exercised that right.

b.  *The secondary factors*

Sandhu also challenges several of the trial court's findings regarding the secondary

factors.[9]

One of the secondary factors is "the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision." (*Borello*, *supra*, 48 Cal.3d at p. 351.) As the trial court accurately recognized, "This factor focuses on how the work 'is usually done' in a given locale, not how the work was done in this particular case." (*Vendor Surveillance Corp. v. Henning*, *supra*, 62 Cal.App.5th at p. 80.) The trial court found the work Sandhu did for all four Cities was "usually done under the supervision of a higher-level City employee." Sandhu does not directly challenge this finding. Instead, he argues "general supervision" is insufficient to establish control, because even true independent contractors may be generally supervised. This may be true, but the trial court's finding that this factor weighed in favor of an employer-employee relationship is supported by the evidence.

It is undisputed the work Sandhu did was usually performed by a permanent city employee under the direction and control of either the city manager or the head of the finance department, and Sandhu was performing that work on an interim basis while the position was vacant and until the city could hire a new employee to fill the position. For example, Sandhu temporarily performed at least some of the duties of Capitola's finance director, who was the head of Capitola's finance department. The Capitola Municipal Code provides the city manager "shall be the administrative head of the government of the city"; "[i]t shall be the duty of the city manager and he or she shall have the authority to control, order and give directions to all heads of departments"; and "department heads are expected to function in accordance with the instructions they receive from the city

---

[9]    He does not challenge all of them, and we will assume any finding that is not challenged is supported by substantial evidence. (See, e.g., *Cameron v. Sacramento County Employees' Retirement System* (2016) 4 Cal.App.5th 1266, 1278 ["factual findings not contested must be accepted as true"].)

manager." (Capitola Mun. Code, §§ 2.08.065, 2.08.090, 2.04.020.) Capitola's city manager thus testified that although he relied on staff "to do much of the work" of preparing the city's budget, "at the end of the day" he was "responsible" for that work, and thus "exercise[d] some sort of authority . . . over" the people who did the work. The municipal codes of the other cities are similar. Thus, the evidence established that, in city government, the work Sandhu was doing on an interim basis was usually done by a city employee under the direction and control of the city. Sandhu argues there is no legal requirement that only a regular city employee may prepare a budget or audit paperwork. He cites no legal authority for this proposition, and even if we assume it is true, it does not change the fact that the work Sandhu was doing is usually performed by an employee rather than an independent contractor. Although this secondary factor is not dispositive, the trial court's finding that it "weighs in favor of an employee-employer relationship" is supported by the evidence.

Another secondary factor is "whether or not the work is a part of the regular business of the principal [here, the Cities]." (*Borello*, *supra*, 48 Cal.3d at p. 351.) The trial court found, "At each of the Cities, Sandhu did work that fell within the ambit of the Cities' financial departments, and which would have been performed by a City employee if certain positions were not then vacant," and that this secondary factor thus weighed in favor of finding an employment relationship. Sandhu argues the Cities "provide[] a broad range of services" and the trial court somehow "misconstrued" their " 'regular business.' " His argument is difficult to understand. To the extent he argues the trial court's finding is not supported by the evidence, we disagree.

The regular business of the Cities is to provide a broad range of municipal services, and each of the Cities has a finance department that is integral to their ability to provide such services. Even Sandhu appears to acknowledge "the budget and audit functions are 'part of the regular business' of a city." Indeed, Capitola's city manager testified the finance department and the finance director are part of the city's regular

31

business.  The trial court's finding that the work Sandhu was performing was part of the regular business of the Cities is supported by the evidence.  Again, although this secondary factor is not dispositive, it weighs in favor of finding an employment relationship.

Finally, Sandhu argues the parties "conformed their relationship" to the terms of the contracts, the contracts demonstrated the parties believed Sandhu was an independent contractor rather than an employee of the Cities, and the contracts should thus define the legal relationship between the parties.  It is undisputed the contracts identify Sandhu as RGS's employee, not the Cities' employee, and they state the Cities "shall have the right to control RGS only insofar as the result of RGS's services rendered" and "shall not have the ability to direct how services are to be performed."  The trial court acknowledged this, but it nonetheless looked behind the contracts and found an employment relationship existed between Sandhu and the Cities.

As even Sandhu at least nominally acknowledges, a long line of authority instructs that "the terminology used in an agreement is not conclusive" as to the existence of an employment relationship.  (*Tieberg*, *supra*, 2 Cal.3d at p. 952.)  "Although the terms of a contract may specify that a special employer retains the right to control the details of an individual's work or purports to establish an employment relationship, 'the terminology used in an agreement is not conclusive.' " (*Kowalski v. Shell Oil Co.*, *supra*, 23 Cal.3d at p. 176.)  "The agreement characterizing the relationship as one of 'client—independent contractor' will be ignored if the parties, by their actual conduct, act like 'employer— employee.' " (*Toyota Motor Sales*, *supra*, 220 Cal.App.3d at p. 877.)  "[T]he label parties attach to their relationship 'is not dispositive and will be ignored if their actual conduct establishes a different relationship.' " (*Gonzales v. San Gabriel Transit, Inc.* (2019) 40 Cal.App.5th 1131, 1152.)

Despite this long line of authority, Sandhu's position appears to be that if the contracts between RGS and the Cities state he is an employee of RGS rather than the

32

Cities, then CalPERS is bound by that designation.  He cites no authority for that proposition, and we are aware of none.  In this regard we note there was a dissenting opinion in *Metropolitan* that, like Sandhu, believed the parties' intent should govern.  The dissent noted "[l]eased workers present a new paradigm" that is based on "a three-sided labor relationship" as opposed to the more traditional two-sided labor relationship.  (*Metropolitan*, *supra*, 32 Cal.4th at pp. 512, 514 (dis. & conc. opn. of Brown, J.).)  It also noted that when the common law employment test was developed, "employee leasing in its purest form did not even exist.  Thus, it differentiates only between employees and independent contractors, not employees and leased workers."  (*Id*. at p. 514 (dis. & conc. opn. of Brown, J.).)  The dissent thought "[c]ommon law rules that evolved to address the traditional two-sided labor paradigm are simply inapposite in this [new three-sided] context," and it suggested the common law test needed to evolve to specifically address leased workers.  (*Ibid*. (dis. & conc. opn. of Brown, J.).)  In particular, it believed that, in leased worker situations, the intent of the parties should be "the principal consideration in determining plaintiffs' employee status."  (*Id*. at p. 515 (dis. & conc. opn. of Brown, J.).)  A dissent, of course, is just that—a dissent—and it is axiomatic that dissents are not the law.  (See *People v. Lopez* (2012) 55 Cal.4th 569, 585.)  Thus, contrary to Sandhu's argument, the parties' characterization of their relationship is not determinative.

In sum, the trial court's findings that the primary factor and three of the secondary factors weigh in favor of an employment relationship are either supported by the evidence or are not challenged by Sandhu.  Moreover, Sandhu does not challenge the trial court's findings that three of the secondary factors are neutral or inapplicable in the facts of this case.  Finally, the one factor that weighs in favor of an independent contractor relationship is not sufficient to overcome the other factors.  We acknowledge there is some evidence in this case that could support a conclusion Sandhu was not a common law employee, however we also find the trial court's contrary conclusion is supported by substantial evidence.

# III

## Sandhu Forfeited His Underground Regulations Argument

Sandhu's final argument is that CalPERS's decision was impermissibly based on underground regulations. " 'An underground regulation is a regulation that a court may determine to be invalid because it was not adopted in substantial compliance with the procedures of the Administrative Procedure Act (Gov. Code, § 11340 et seq.) (APA). [Citation.] To be deemed an underground regulation, [the purported regulation] must meet two requirements: (1) the agency must intend it to apply generally rather than in a specific case; and (2) the agency must adopt it to implement, interpret, or make specific the law enforced by the agency.' " (*Patterson Flying Service v. Department of Pesticide Regulation* (2008) 161 Cal.App.4th 411, 429.)

In his petition for writ of mandate Sandhu alleged "the challenged decision is predicated on unlawful 'underground regulations' and, thus, is ultra vires." No further explanation was provided. In its decision denying the petition, the trial court stated in a footnote that it "did not address" this allegation "since it was not raised in Sandhu's opening brief. Further, Sandhu states in his reply brief that his 'underground regulation allegation is simply noted.' (Pet'r Reply 3, fn.1.)" The trial court's description of Sandhu's briefs is accurate: he did not mention the underground regulation argument in his opening brief, and he mentioned it only in passing, and in a footnote, in his reply brief. The trial court acted well within its discretion when it declined to address this argument. "[A]rguments raised for the first time in a reply will not be considered," and this is particularly true where the argument is raised only in a footnote. (*Gormley v. Gonzalez* (2022) 84 Cal.App.5th 72, 82.) Moreover, "A court need not consider an issue where reasoned, substantial argument and citation to supporting authorities are lacking." (*Woods v. Horton* (2008) 167 Cal.App.4th 658, 677.)

Having failed to properly raise the underground regulation issue in the trial court, Sandhu has "forfeit[ed] on appeal any claim of error based on that issue." (*Howitson v. Evans Hotels, LLC*, *supra*, 81 Cal.App.5th at p. 489.)

**DISPOSITION**

The judgment is affirmed. The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(5).)

 

 

_____/s/_____
EARL, P. J.

We concur:

 

_____/s/_____
MESIWALA, J.

 

_____/s/_____
WISEMAN, J.*

---

\* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.